IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 22, 2025

**STATE OF TENNESSEE v. LAMISHA LANEA HAYNES**

**Appeal from the Circuit Court for Dickson County**
**No. 22C-2021-CR-294     Larry J. Wallace, Judge**

_____

**No. M2023-01766-CCA-R3-CD**
_____

A Dickson County jury convicted the Defendant, Lamisha Lanea Haynes, of second degree murder, and the trial court sentenced the Defendant as a Range I offender to serve twenty years in the Tennessee Department of Correction.  On appeal, the Defendant asserts: (1) the evidence is insufficient to sustain her conviction; (2) the trial court improperly excluded testimony about the victim's prior gun use; (3) the trial court improperly instructed the jury on flight; and (4) her sentence is excessive.  The Defendant also claims that the cumulative error of these issues warrants relief.  After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Nick McGregor, Nashville, Tennessee, for the appellant, Lamisha Lanea Haynes.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Wendell Ray Crouch, Jr., District Attorney General; and Jack T. Arnold and Erin Danielle Bryson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the shooting death of Cournisha Northington ("the victim") in Dickson, Tennessee.  The Defendant and the victim had a contentious relationship due to a Facebook post the Defendant made about the victim's son and an alleged inappropriate relationship between the Defendant and the father of the victim's children.  After weeks of heated texting, calls, and social media contact, the victim drove to Sarah List's residence on Pond Rail Road ("Pond Rail residence") to confront the Defendant.  This interaction

resulted in the Defendant shooting and killing the victim at the back door of the residence. A Dickson County grand jury indicted the Defendant for the first degree premeditated murder of the victim.

The case proceeded to trial where the parties presented the following evidence. On July 31, 2021, the victim, took her daughter, Ms. Shavonna Vaughn, and her niece, Shamonyae Primm, school shopping. The victim and Ms. Vaughn left between 1:00 and 2:00 p.m., and, before picking up Ms. Primm, drove to the Pond Rail residence located on a dead-end street. Ms. Vaughn testified that she did not know who lived at the residence, but she knew that the victim was upset about a Facebook post related to the victim's son and "something about [Andre Vaughn's] wallet being stolen." The victim knocked on the back door and, when no one answered, they left. The victim and Ms. Vaughn then picked up Ms. Primm and went shopping.

The victim, Ms. Vaughn, and Ms. Primm returned to Dickson after dark, and the victim again drove to the Pond Rail residence. The victim pulled up her car past a gold car that was parked in the driveway. The victim told Ms. Vaughn "not to get out for anything" and then she walked up to the residence. Ms. Vaughn waited in the car, her window rolled down, and watched as her mother approached the back door and knocked. Someone answered the door, Ms. Vaughn saw the victim raise her foot as if to step forward and then stumble backward holding her chest. The victim then yelled, "they shot me." Ms. Vaughn testified that she never saw her mother try to open the back door or kick the door. She reiterated that the victim only knocked on the door and then waited. Ms. Vaughn recalled that she heard two gunshots before the victim grabbed her chest.

Upon hearing the victim yell, Ms. Vaughn and Ms. Primm exited the car and ran to where the victim was lying on the ground. Soon after, Sarah List exited her house, asking what had happened. Ms. Vaughn and Ms. List immediately began "to fight." As they fought, Ms. Vaughn glanced up and saw a Black woman with "red braids," who she later learned was the Defendant. The fight ended when Ms. Primm indicated she was having trouble notifying 911 of the shooting. Ms. Vaughn called 911 and, while she waited two neighbors, a man and a woman, approached. Ms. Vaughn walked with the neighbors to their house, and the man called 911. He told Ms. Vaughn that the victim "was gone." Ms. Vaughn stated that she did not see the Defendant again because the Defendant left in a "silver-ish" car.

On cross-examination, Ms. Vaughn confirmed that, over the course of the week leading up to the shooting, she had overheard the victim "yelling" about the Facebook post during multiple phone calls. Ms. Vaughn did not know at whom Ms. Vaughn was yelling on these phone calls. Ms. Vaughn confirmed that the victim was angry at the Defendant. She agreed that the victim had a temper but stated that the victim kept her temper "under

2

control." She agreed that the victim was angry about the Facebook post but that the victim's demeanor was calm when she knocked on the door on the second trip to the Pond Rail residence. After knocking on the door, the victim stood waiting with her hands behind her back. Ms. Vaughn agreed that at the time of the shooting, it was dark outside but that the back porch lights were illuminated.

Ms. Vaughn clarified that, before getting out of the car, the victim told her to stay in the car unless the victim needed Ms. Vaughn. Ms. Vaughn believed the victim meant that Ms. Vaughn should get out of the car if the victim "got hurt or anything." She agreed that she told Lieutenant Sarah Humphreys during an interview that the victim was "partially inside the door." Ms. Vaughn identified on a photograph of the back door, the white door frame that the victim had "stepped up on" before she was shot.

Ms. Primm, the victim's niece, confirmed that she went shopping with the victim and Ms. Vaughn on July 31, 2021. She recounted that, before taking Ms. Primm home, the victim stopped at the Pond Rail residence, which was approximately five minutes away from Ms. Primm's residence. Ms. Primm was unaware they were going to stop at the Pond Rail residence. While they waited in the car, Ms. Primm sat in the back seat behind the front passenger seat, listening to music with her AirPods and "scrolling the internet." Ms. Primm was not paying attention to anything beyond her phone until Ms. Vaughn "jumped out the car." Ms. Primm put her AirPods in their case, got out of the car, and ran with Ms. Vaughn to the back of the house. Ms. Primm saw the victim "crawling," and Ms. List exit the house and ask, "what's going on?" Ms. Vaughn began yelling at Ms. List while Ms. Primm watched as the victim crawled through the grass. Ms. Primm looked inside the house and saw the Defendant "stuffing something in her purse." Ms. Primm knew the Defendant, explaining that she had started to enter the house but backed away when she saw the Defendant. At this point, Ms. Vaughn and Ms. List were fighting.

Ms. Primm called 911 but was having difficulty speaking due to shock, so the 911 operator disconnected the call. Ms. Primm and Ms. Vaughn ran to the neighbor's house and found Ms. List already there. Ms. Vaughn and Ms. Primm began yelling at Ms. List until the neighbor separated them. Ms. Vaughn returned to Ms. List's house with the neighbor who told them that the victim had been fatally shot in the head. Ms. Primm recalled that the Defendant drove away in the gold car, almost hitting her as she sped away.

Thomas Jennings testified that on July 31, 2021, the Defendant and a friend picked him up in Nashville, and they drove to the Pond Rail residence. They arrived in Dickson after dark and had been inside the house for about thirty minutes when Mr. Jennings heard gunfire. He was in a bedroom in the house and did not see any of the events, but he heard someone enter the house and say, "Where [the Defendant] at?" followed by a gunshot. Mr.

3

Jennings heard what he thought was a child crying, and then he ran out the front door. He got in the car with the Defendant, and they drove away.

As the Defendant and Mr. Jennings drove away from the Pond Rail residence, police stopped their vehicle. Mr. Jennings testified that he had never been to the Pond Rail residence before and was unaware of any dispute between the Defendant and the victim. Mr. Jennings denied that he heard anyone kick the door prior to the shooting. Earlier, before the shooting, the Defendant told Mr. Jennings that "outside the city limits it's okay to shoot." She then went out to shoot her gun in the back yard.

Sarah List lived at the Pond Rail residence with her three children. At the time of these events, however, her children were living somewhere else and only the Defendant and Mr. Jennings were in the residence. The Defendant normally resided at East Railroad Street but had been staying with Ms. List. Ms. List grew up in Dickson with both the Defendant and the victim and considered herself friends with both women. The Defendant and the victim, however, were not friends. Ms. List was aware of tension between the Defendant and the victim and attributed part of the tension to the fact that the Defendant was in a relationship with the victim's children's father, Andre Vaughn.

On July 30, 2021, the day before the shooting, the Defendant's daughter told the Defendant that Mr. Vaughn had "smacked [her] on the butt," triggering an argument between the Defendant and Mr. Vaughn. The following day, Ms. List drove to Nashville with the Defendant in the Defendant's tan Impala. Ms. List confirmed that she had been using drugs, but she did not believe her drug use had affected her memory. Ms. List slept during the drive but woke up to go inside Mr. Jennings's apartment where she went back to sleep on the couch. The State showed Ms. List a Facebook video taken at Mr. Jennings's apartment that day. Ms. List had not been aware of the Facebook post at issue because she had been sleeping on and off throughout July 31, 2021, but identified the apartment as Mr. Jennings's apartment and identified the Defendant in the Facebook Live video. In the recording, the Defendant spoke disparagingly about the victim and made several references to fighting. During the recording, a user identified by the victim's name, posted a comment, which read, "When I came in that house on you and Sarah [List], why you didn't do anything?"

In reference to the post, Ms. List explained that the victim had come to her house a "couple of weeks prior" and kicked in the door. The Defendant and Ms. List were asleep with their children but were awakened by the victim yelling at the Defendant. Ms. List explained that she knew the victim kicked open the door because she heard the door hit the deep freezer. Ms. List agreed that she had previously told Detective Humphreys that the victim likely entered through an unlocked door. Ms. List added to her statement to

4

Detective Humphreys, saying, "it wasn't unusual for me to leave my door unlocked." The victim remained in the house for five to ten minutes and then left.

Ms. List returned to her account of the day of the shooting, saying that the Defendant, Ms. List, and Mr. Jennings drove back to Dickson arriving at around 8:30 or 9:00 p.m. Ms. List did not really know Mr. Jennings having only seen him on one prior occasion, confirming that he had never been to her house before. When she arrived home, she showered. Ms. List then described the following events:

> I was sitting on the bed. I heard a car come into the driveway really fast. It threw gravel everywhere. I heard my door kick open. I heard [the victim] clapping her hands saying, "Come on out, bitch. Come on out. I'm going to drag you." I heard - - I don't know if she said "he" or "she", but I heard, "They got a gun." And then I heard the loudest pop I've ever heard in my life. And then I heard feet running out the back door. I heard her say, "I've been shot."

Upon further questioning, Ms. List agreed that it was not uncommon for the victim to drive rapidly down the driveway slinging gravel as she entered. Ms. List explained that she did not see any of these events but knew the sounds to be what she described to the jury as she recognized the sound of sneakers hitting the tile floor in her kitchen. Ms. List confirmed that she told both Detective Lovell and Detective Humphreys that she heard feet running out the back door.

Ms. List was initially shocked by the sound of gunfire but quickly gathered herself and ran out of her bedroom. Both her front and back doors were open. She ran out the back door, the area from which she had heard the retreating steps, and Ms. Vaughn hit Ms. List in the mouth. Ms. List threw up her arms and pushed Ms. Vaughn out of the way so that she could see out the back door, and she saw the victim's body lying by the porch. Ms. List's cell phone battery had died, so she ran out the front door and to her neighbor's house. Ms. List asked her neighbor, Donna Thompson, to call 911 and asked Ms. Thompson's boyfriend, Michael Dotson, to go to her house and check on the victim. When Mr. Dotson returned, he told Ms. List that the victim was dead. Ms. List saw the Defendant drive away but could not tell if anyone was with her. Ms. List said that she was unaware of whether the Defendant had a gun that night but confirmed that she did not have any guns in her residence.

On cross-examination, Ms. List stated that she had not seen the Defendant in her backyard at any point on the night of the shooting. Ms. List did not know if the victim had a gun with her that night but had known the victim to carry a gun before. She confirmed that she had witnessed the victim act aggressively toward the Defendant.

5

Defense counsel requested a jury out hearing on testimony related to the Defendant's reasonable fear. Ms. List reiterated that she had seen the victim with a firearm before. The incident occurred a month or more before the shooting in this case. The victim had been at Brandon Davis's house and engaged in an argument with several people there. The victim showed up at Ms. List's house and told her to follow the victim home. Ms. List drove to the victim's house, and the victim got into Ms. List's car. Ms. List drove the victim by Mr. Davis's house where the victim fired her gun twice into the air before they returned to Ms. List's house. Ms. List stated that no one was outside Mr. Davis's house at the time the victim fired the gun and that the victim fired the gun "into the air." Ms. List was unsure if the Defendant was aware of this incident at Mr. Davis's house. She stated that she "might have told [the Defendant]."

After hearing this testimony, the trial court made the following findings:

All right. So, you know, it's a close issue for sure. I don't believe the clear and convincing factor plays a role in this particular thing since it's the -- since it's not the evidence of the defendant, you know, character evidence of the defendant.

So there's a case of *White v. State*, 2020 Lexis 61, issued on February 3rd, 2020. And it goes into that a little bit. It says:

"Since the evidence cannot be used substantively, it is not controlled by TRE 404(a)(2) and TRE 405. Such evidence must still satisfy the balancing test set forth in 403. Thus, before a trial court can admit evidence of a victim's prior violent acts to corroborate a defendant's claim that the victim was the first aggressor, the following requirements must be met."

"One, the issue of self-defense must be raised by the proof and not simply by statements of counsel."

"Two, there must be a factual basis for the defendant's claim that the victim had first aggressor tendencies."

"And three, the probative value of the evidence must outweigh the danger of unfair prejudice."

So it's an equal balancing test on that.

6

You know, there is some evidence that she -- you know, at least circumstantial evidence that she was coming to the house and those kind of things. But I am having a little bit of difficulty finding that the defendant was aware of this incident for sure. You know, I mean, the witness, Ms. List, testified that she may or may not have told her. I mean, she doesn't seem certain about it, from the Court's perspective anyway.

So the Court is going find that the probative value does not outweigh the danger of unfair prejudice. I think it gets into -- and it's semi close, but it's not as close as I would prefer with the nexus. So I'm going to say it shouldn't come in, all right.

Defense counsel submitted the jury-out testimony as an offer of proof.

Cross-examination continued in the presence of the jury. Ms. List stated that she did not see anyone touch or move the victim following the shooting, but that Ms. Vaughn and Ms. Primm were "moving around in the backyard."

Dickson Police Department Corporal Justin Steward received a call about a shooting in the county, outside the city limits. As he drove toward the scene, he saw a vehicle that matched the description of the vehicle related to the shooting. Corporal Steward stopped the vehicle. A video recording of the body camera he wore that evening was played for the jury but was not included in the record. Corporal Steward referenced the video showing the Defendant being taken into custody outside of her vehicle. She told Corporal Steward that Mr. Jennings did not have anything to do "with it" and that she had been giving him a ride.

Corporal Steward assisted in the search of the Defendant's vehicle during which law enforcement found drugs and drug paraphernalia, but no gun. Corporal Steward asked the Defendant if she needed any medical treatment, and the Defendant responded that she needed her mental health doctor. Shortly after he pulled the Defendant over, it began raining heavily.

On cross-examination, he described Mr. Jennings and the Defendant as "very cooperative." Corporal Steward agreed that he suspected that both Mr. Jennings and the Defendant had used drugs, but his suspicion was not based on their behavior, rather it was due to the items found during the search of the Defendant's car.

Dickson County Sheriff's Office (DCSO) Sergeant Brian Cave arrived at Buddy Road and Highway 70 where the Defendant was taken into custody. At some point, the

7

Defendant said she was not feeling well, so Sergeant Cave transported the Defendant to the hospital. While they waited, he did not question the Defendant, but she made a "spontaneous utterance." The Defendant stated, "I killed her. I killed her because she threatened to kill me." After she was released from the hospital, Sergeant Cave transported the Defendant to the Dickson County jail for questioning.

Court was adjourned for the day and the following morning, before the jury entered, the State, pursuant to Tennessee Rule of Professional Responsibility 3.8, the State disclosed that Ms. List had made an alternate statement at trial than she had to the State pre-trial. The State recounted that the trial court asked Ms. List if she had told the Defendant about the incident where the victim was shooting into the air. Ms. List responded, "I may have mentioned it;" however, Ms. List told the prosecutor and Lieutenant Humphreys , "Oh, yeah. I told her. It really freaked me out." In light of this information, the Defendant asked the trial court to reconsider its ruling prohibiting Ms. List from testifying about the victim shooting in the air outside of Mr. Davis's house. The trial court took the request under advisement.

DCSO Deputy Jacob Brake responded to a shooting on Pond Rail Road. After confirming that the victim was deceased, he interviewed witnesses and obtained a vehicle description that he relayed to law enforcement. Deputy Brake wore a body camera, and the video was played for the jury. The footage showed the deputy entering the front door of Ms. List's house, walking through the house, and exiting the back door. A woman who was standing near the victim's body told the deputy that she tried to save the victim. Deputy Brake told her not to touch the victim and then he asked who shot the victim. The woman responded, "Meesha Hayes or Haynes." The woman told Deputy Blake that the Defendant "almost hit us" as she left in a tan Impala. Over the radio, the deputy shared the car description. It appears Deputy Blake walked around the side of the house to the front yard where multiple witnesses were present. He approached Sarah List, who provided the Defendant's and the victim's names. She confirmed that the Defendant left in an Impala. The deputy said aloud that the Defendant was headed toward White Bluff, "so if White Bluff can spike them." The voice of another officer can be heard saying something inaudible, and the deputy responded, "yeah, they are in a pursuit with them." The remaining portion of the video captured a chaotic and emotional crime scene as a thunderstorm moved in and the victim's family members began arriving.

DCSO Detective Brent Johnson became involved in the case on August 2, 2021. Detective Humphreys asked Detective Johnson to retrieve the Defendant's clothing from the jail and to return to the Pond Rail residence and search for a cartridge casing. Detective Johnson obtained the clothes and proceeded to the Pond Rail residence. Detective Humphreys attended the autopsy and notified Detective Johnson that a .22 round had been recovered from the body. He was unable to find a cartridge casing. He inspected the back

door for any sign of forced entry and then searched the house, finding "a few different items," including a handgun. As to the back door, the bolt and door lock were not broken, and the door itself was intact. Detective Johnson identified a photograph of the door. The photograph depicts a door with what appears to be normal wear and tear, but no damage consistent with a person breaking open a door. Outside of the house, Detective Johnson found a pair of glasses that belonged to the victim.

Also, outside the house along the fence line, the detective found a "charging rod" and a .22 caliber handgun. The charging rod had come out of the weapon and was lying within three feet of the handgun. The handgun's cylinder was open with both spent and unspent rounds inside. He collected the gun and charging rod for evidence, and the items were sent to the Tennessee Bureau of Investigation ("TBI") for test firing. The items were found close to the six-foot-tall privacy fence. Given the location and state of the weapon, Detective Johnson suspected that the gun had "bounced off the fence."

On cross-examination, Detective Johnson clarified that it appeared that the gun had been "thrown or tossed and hit the fence and then bounced back in the yard." The area where the gun was found was approximately fifty feet from the corner of Ms. List's house.

Deputy Colt Lane worked at the Dickson County jail and was present when the Defendant gave a statement to the news media on August 2, 2021. Deputy Lane wore a body camera at the time and identified the footage recorded that day on his body camera. In the footage, the Defendant denied having any memory of the events on the night of the shooting. She recalled that she only remembered being stopped in her car and waking up in jail. When asked how she knew the victim, she said that they had children of similar ages but that they were not friends. She said she had not seen the victim in years. The reporter asked the Defendant several times if she shot the victim. Each time the Defendant responded that she did not know, she had no memory of the events. She said she had health issues that might have contributed to her lack of memory about the events but also, she had used some cocaine, crystal meth and alcohol.

Deputy Lane confirmed that he was present when the Defendant reported to another officer a threat she received from one of "the witnesses for the family." He could not recall exactly what was said during the conversation between the officer and the Defendant or if it was related to "this trial."

Rickey Kelly spoke with the Defendant at around 1:00 p.m. on July 21, 2021. The Defendant called Mr. Kelly and asked him whether, if someone had threatened her life and threatened to "come kick the door in," she had the right to "do whatever." Mr. Kelly told the Defendant that she had the right to defend herself if someone threatened her.

9

Emily Dennison testified as an expert witness in the field of forensic pathology and performed the autopsy in this case. Following her examination, Dr. Dennison concluded that the cause of death was a penetrating gunshot wound to the chest. Dr. Dennison found no other significant recent wounds, only an abrasion to the victim's eyebrow.

After the jury was excused for the day, the trial court revisited the exclusion of Sarah List's testimony about the victim shooting into the air and found the testimony admissible.

DCSO Lieutenant Sarah Humphreys responded to Horizon Medical Center in Dickson, Tennessee where the Defendant was being treated. Lieutenant Humphreys attempted to talk with the Defendant, but the Defendant "seemed to either be impaired, intoxicated, acting that way, or just didn't want to talk to [her]." Lieutenant Humphreys left the hospital and drove to the Dickson Police Department to speak with Mr. Jennings. Lieutenant Humphreys photographed Mr. Jennings and swabbed his hands for gunshot residue.

Two days later, on August 2, 2021, Lieutenant Humphreys conducted an audio-recorded interview of the Defendant. The Defendant reported three injuries, and the lieutenant photographed two bruises on the Defendant's leg and a scratch "slightly above her armpit." Lieutenant Humphreys also searched the Defendant's "tan or gold" car and collected a cell phone.

The State played the audio-recorded interview. In the recording, the Defendant stated that the victim was angry because she believed Ms. List was dating Mr. Vaughn. The Defendant then described several interactions, via social media, phone, and in person, she had with the victim leading up to the shooting. One such occasion involved the victim storming into Ms. List's house, angry at Ms. List. The Defendant told the victim that it was she, not Ms. List, who had sex with Andre Vaughn, the victim's children's father but that it had occurred only one time. According to the Defendant, the victim did not appear angry at this admission but maintained her focus on and anger at Ms. List. As to why she could not recall the events of the night of the shooting, the Defendant explained to Lieutenant Humphreys that she had not been sleeping and had been using drugs, including Xanax. She stated that she had once before used Xanax during her grandmother's funeral and lost portions of her memory during that time.

About the day of the shooting, the Defendant told Lieutenant Humphreys that she and Ms. List drove to Nashville where she had a chance meeting with Mr. Jennings, and he agreed to return to Dickson with them. They drove back to Dickson and the last thing that the Defendant could recall before the shooting was sitting on Ms. List's bed. The next thing she could remember was the police stopping her car. She could recall some details of the stop with specificity but not others. The Defendant denied owning or possessing a

gun. She told Lieutenant Humphreys that Ms. List had a gun at one point but was suicidal, so the Defendant had taken it away from Ms. List. The Defendant maintained that she was unable to remember any of the events of the shooting.

In the audio-recorded interview the Defendant told Lieutenant Humphreys that the victim was repeatedly calling Ms. List's cell phone, so the Defendant changed Ms. List's outgoing message on her cell phone to provide all the Defendant's contact information. The State played the outgoing message on Ms. List's cell phone.

TBI Special Agent Savannah Houk testified as an expert witness in the field of firearm and tool mark identification and conducted the examination of the short-barreled .22 revolver recovered in this case. Special Agent Houk received a T-shirt, a revolver, four cartridge cases, two cartridges, and one bullet for examination. The firearm functioned normally, and the cartridge cases bore the same class characteristics as the test fires; however, there were not enough reproducible individual characteristics for Special Agent Houk to be able to confirm that the cartridge cases came from the firearm. Similarly, the bullet had similar class characteristics; nonetheless, the bullet was so damaged that Special Agent Houk was unable to confirm that the bullet had been fired from the short-barreled .22 revolver. Special Agent Houk noted that semi-automatic weapons leave characteristics that often revolvers do not. Additionally, a lack of cleaning of a revolver could cause similar results due to dirt or rust build-up. She summarized her findings, stating that the firearm was consistent with delivering that bullet but could not be conclusively established as having done so.

DCSO Detective Douglas Kimbro conducted a forensic examination of the Defendant's Samsung Galaxy A21 and the victim's Galaxy S10 and Galaxy A51 TracFone. The State introduced Facebook Messenger messages from July 29, 2021, at 3:38 p.m. between the Defendant and Mr. Vaughn. In the messages, the Defendant confronted Mr. Vaughn about his interaction with her daughter. The State introduced communication from July 31, 2021, between the Defendant and the victim.

Victim:      We can't help that your daughter's a whore.

Defendant:      Says the one who f**ked all [her] business brothers and he f**ked your mom baby daddy brothers.

Victim:      Four laughing emojis

Defendant:      Mom

Victim:      I'm still going to drag your ass. Where you at?

| | |
|---|---|
| Defendant: | I ain't switched locations, so pull up.  Never scared. |
| Victim: | Your daughter has two kids, not even 20.  But a mean that older than her. |
| Defendant: | No. Jane boo is the one he touched yah's friend. |
| Victim: | You were scared when I came there the first time, bitch.  Stop playing. |
| Defendant: | Sharell Lenox |
| Victim: | And your mama raised half your kids.  Sit down |
| Defendant: | If I |
| Victim: | When you get your ass whoop, don't call the police. |
| Defendant: | Thumbs up emoji. |

The Defendant sent a voice message denying that she was scared.  She asserted that the victim was angry because she was "irrelevant in everybody's life."  She then listed all the people to whom the victim was "irrelevant."  She concluded by stating that no one wanted the victim and "kill yourself, boo."

| | |
|---|---|
| Defendant: | Come on, plenty of space and opportunity. |
| Victim: | We will see. |
| Defendant: | We, girl. It's just me, so y'all come on. |
| Victim: | Who is y'all?  I drag holes by myself.  And let Sarah know she is in it too.  I know your hole have my kids security card. |

In response, the Defendant sent two voice messages.  In the first, the Defendant denied having the victim's children's social security cards.  She called the victim a fool and told her to "come on and look at whatever you want to look and do whatever you say you gonna do.  Cuz like I said, I ain't scared."  In the second message, the Defendant told the victim that she "figured out what it is with Sarah."  She claimed that the victim was just mad

12

because Ms. List does not want "to be with" the victim. The Defendant said, "It's all about me, remember?" The Defendant sent a thumbs up emoji and then about thirty minutes later, she sent two more voice messages making threatening and jeering comments toward the victim.

TBI Special Agent Lindsey Anderson analyzed the gunshot residue kit submitted for Thomas Jennings. The examination and analysis did not reveal the presence of gunshot primer residue. She stated that this finding is consistent with someone who had not recently fired a weapon; however, this finding could also be consistent with particles having worn off over time, handwashing, or other routine activities. Special Agent Anderson also examined the Defendant's clothing. On these items, she confirmed the presence of multiple particles characteristic of gunshot residue.

DCSO Jeff Lovell was the lead detective in this case and recalled a significant storm on the night of the shooting. Detective Lovell photographed the scene and then attempted to draw a crime scene sketch but was unable to do so due to the rain. Next, he interviewed the victim's daughter and niece, who had been separated. He looked for signs of forced entry to the back door and found none. He did not see any evidence of a struggle inside the house. As he investigated the house, he noticed that the shower had been recently used, consistent with Ms. List's testimony that she had showered just before the shooting. He then proceeded to the sheriff's office to interview Ms. List.

As the investigation progressed and more information was collected, it appeared that there was an issue between the Defendant and the victim. Based upon the recorded voice messages from the Defendant, Detective Lovell believed the Defendant was "antagonizing" the victim and "luring" the victim to Ms. List's house where the unarmed victim was ultimately shot and killed. He confirmed that there was "zero evidence" that the victim entered the house. Ms. List was at her house when the police arrived and provided the information that she, the Defendant, and Mr. Jennings had all been present at the house but that the Defendant and Mr. Jennings had fled. Law enforcement detained the Defendant about eight miles from Ms. List's house, headed toward White Bluff, Tennessee.

The State closed its case-in-chief, and the Defendant prepared to call two witnesses, neither of which were Ms. List. The trial court noted that it had reversed its decision to preclude Ms. List from testifying about an incident where the victim fired a gun into the air and sought to confirm that the Defendant was electing not to call Ms. List. Defense counsel responded saying that one of the witnesses the defense planned to call would testify about the gunfire instead.

13

The Defendant's first witness, Celeste Jones, identified herself in police body camera footage urging police officers to place Ms. List in a vehicle for protection from the victim's family. Ms. Jones told the officer that the disagreement between the victim and the Defendant had been "escalating for weeks." Ms. Jones confirmed that the police never asked her for a statement.

On cross-examination, Ms. Jones admitted that she was not present during the shooting. She was asleep at home when Ms. List's mother called and told her that the Defendant had shot the victim. Ms. Jones immediately went to the scene because Ms. List "has mental issues, and [she] knew how close her and [the victim] were."

At the time of the shooting, Michael Dotson lived on Pond Rail Road next to Ms. List's house. Earlier on the day of the shooting during "the daylight hours," Mr. Dotson heard gunfire and saw the victim leaving Ms. List's house. He did not know the victim personally but recognized her. Later that day, he heard gunfire and went over to Ms. List's house where he saw the victim lying in the yard. Inside the house, he saw the victim's shoe.

On cross-examination, Mr. Dotson admitted to multiple convictions including TennCare fraud and theft of property. Mr. Dotson confirmed that the Defendant told him that she had shot the victim. He did not recall telling the police that the Defendant said, "she had a gun and so I capped her," but he agreed that if that is what he told the police following the shooting, it was probably more accurate than his present recollection. Mr. Dotson saw the Defendant with a gun following the shooting and weeks before the shooting, she had told Mr. Dotson she needed a gun because she was afraid of an ex-boyfriend.

After the shooting, Ms. List, Ms. Vaughn, Ms. Primm, the Defendant, and Mr. Jennings came to Mr. Dotson's house. He described Mr. Jennings as "freaked out" and recalled Mr. Jennings saying, "he didn't have nothing to do with none of this." Mr. Dotson spoke with the Defendant on the side of his house, and she had admitted to shooting the victim. After her admission, Mr. Dotson returned to his porch and told Ms. Vaughn that the Defendant had shot her mother. He further advised Ms. Vaughn to leave because the Defendant still had a gun, and he did not want "nobody else to get shot."

Mr. Dotson spoke with the police on August 4, 2021. Inconsistent with his earlier testimony that the first shooting occurred during daylight hours, Mr. Dotson told the police that the first set of gunfire occurred at 8:30 p.m. When confronted with the fact that 8:30 p.m. was about an hour before the shooting, Mr. Dotson agreed that his timeline was "probably not exact."

14

After hearing this evidence, the jury convicted the Defendant of the lesser-included offense of second degree murder.

## B. Sentencing Hearing

At the sentencing hearing, the State called two witnesses, and the Defendant called two witnesses. Officer Kristina Bright, a Tennessee Department of Correction probation officer, prepared the presentence report. The report indicated that the Defendant had one felony conviction and at least eight misdemeanors. Further, the Defendant had one probation revocation. In an interview with a probation officer, the Defendant disclosed that she had been using illegal drugs, on and off, since she was sixteen and that she had used meth on the day of the shooting. The presentence report also contained a StrongR Assessment that indicated the general likelihood of re-offense. The Defendant's risk score was high. The State offered several written victim impact statements, and the victim's daughter provided testimony of victim impact at the hearing.

Valarie Salyer testified on the Defendant's behalf. Ms. Salyer worked as the Jail Coordinator for Alcoholics Anonymous ("AA"). It is in this capacity that Ms. Salyer had come to know the Defendant. Ms. Salyer said that the Defendant had been an active member of the group since the time she arrived at the jail. The previous Friday night, the Defendant had celebrated two years of sober recovery in jail. About the Defendant's sobriety and recovery, Ms. Salyer said:

> We know they can have access and she has chosen to remain sober and work this program like no one I have ever seen. Her hope and her spirit is absolutely inspiring. It is amazing. She shares on a regular basis, she talks about her wrongs, and she knows that her addiction is what controlled and dominated and motivated her life. Ms. Salyers believed that the [D]efendant had changed "180 percent" and that the Defendant's change had been authentic.

The Defendant's AA sponsor ("the Sponsor") testified about the unique change that she had seen in the Defendant as she worked on her recovery from addiction. As an example of how much the Sponsor believed in the Defendant's recovery, she told the trial court that she had offered the Defendant the extra bedroom in the Sponsor's home upon release.

The Defendant gave a statement in allocution apologizing for her acts and the impact on the victim's family and her own.

15

The State filed a notice of two enhancement factors. Enhancement factor (1), the Defendant's previous criminal history and criminal behavior based upon the Defendant's prior felony conviction and multiple misdemeanor convictions. T.C.A. § 40-35-114. The State asserted that the Defendant's prior offenses showed a series of choices that led to the events of her current conviction. The State also submitted that enhancement factor (9) applied, that the Defendant possessed or employed a firearm during the commission of the offense. *Id.* The Defendant acquired the gun ahead of time and practiced with the gun in the back yard.

Pursuant to Tennessee Code Annotated section 40-35-113, the Defendant submitted that three mitigating factors applied. The Defendant argued that strong provocation, mitigating factor (2), existed in that the victim went to the Pond Rail residence at night. Defendant also argued that mitigating factor (3), that substantial grounds existed to justify the Defendant's conduct, was applicable. The Defendant also argued that mitigating factor (9) applied because the Defendant cooperated with authorities by confessing to the arresting officer and "the reporter with the Sheriff's Office." The defense argued that the Defendant did not seek out the victim in this case. Finally, the Defendant submitted that mitigating factor (13), "the catch-all" factor, applied. The Defendant asked the trial court to consider the Defendant's underlying mental health issues, her time working on recovery in AA meetings, and that she had lived under more stringent circumstances in the jail since she was not transferred to the Department of Correction.

First the trial court gave some weight to mitigating factors (2), (9), and (13). T.C.A. § 40-35-113. The trial court declined to apply mitigating factor (3), that substantial grounds existed tending to excuse or justify the Defendant's conduct. The trial court found that the Defendant was under the influence of meth at the time of the shooting and then fled the scene, which was her residence at that time. Further, the trial court acknowledged that there was a disagreement between the women, however, the evidence showed that the Defendant was encouraging the victim to come to the residence. As such, the trial court declined to apply factor (3).

The trial court then considered enhancement factors, applying both factor (1) and factor (9). T.C.A. § 40-35-114. The trial court found that the Defendant's felony conviction and multiple misdemeanors, in addition to her illegal drug use on the day of the shooting, demonstrated a previous history of criminal convictions and behavior. The trial court applied "a lot of weight to that." The trial court also applied "a lot of weight" to enhancement factor (9), that the Defendant employed a firearm during the commission of the offense. *Id.* Additionally, the trial court applied enhancement factor (10), that the Defendant had no hesitation about committing the crime when the risk to human life was high. *Id.* The trial court made the following findings as to this factor:

16

So in this case of course we had Ms. List and I believe Mr. Jennings were the two people in the home when this crime occurred. When the shooting occurred. So Sarah List and Thomas Jennings is what I had down. So that factor, the Court does apply some weight to it and finds that it is appropriate for an enhancer.

The trial court then sentenced the Defendant as a Range I, standard offender, to serve twenty years in the Tennessee Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the evidence is insufficient to sustain her conviction; (2) the trial court erred when it excluded evidence of the victim's past violence; (3) the trial court erred when it gave the jury an instruction on flight; (4) her sentence is excessive; and (5) she is entitled to relief based upon cumulative error.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her conviction for second degree murder because she acted in self-defense. The State responds that the evidence is more than sufficient to support the Defendant's second degree murder conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon

direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

A conviction for second degree murder requires proof beyond a reasonable doubt that the Defendant unlawfully and knowingly killed the victim. *See* T.C.A. §§ 39-13-201, -210(a)(1) (2018). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b) (2018).

The evidence, viewed in the light most favorable to the State, showed that the Defendant and the victim had an ongoing dispute. Facebook footage, voice messages, and

18

text messages showed animosity between the two parties with the Defendant urging the victim on the day of the shooting to "come on." Several weeks before the shooting, the Defendant sought to obtain a gun from Mr. Dotson. On the day of the shooting, the Defendant asked a friend about the legality of firing a gun outside the city limits. That night, Ms. Vaughn watched the unarmed victim knock on the back door of Ms. List's house and then step backward yelling, "They shot me." The victim then dropped to the ground and crawled a short distance. Ms. Vaughn, who was sitting in the car, testified that her mother never entered Ms. List's house. Ms. Vaughn and Ms. Primm rushed to the victim who was lying in the yard. From this location, Ms. Primm saw the Defendant inside Ms. List's house shoving something inside her purse. At the side of the neighbor's yard, the Defendant admitted to Mr. Dotson that she had shot the victim, and police officers recovered a gun in Ms. List's yard by the fence that ran between the neighbor's yard and Ms. List's yard. After talking with Mr. Dotson, the Defendant fled in her car. After a pursuit, law enforcement stopped the Defendant's car as she drove toward White Bluff. According to the medical examiner, the victim was fatally shot one time in the chest. A bullet found lodged inside the victim's body was the same caliber as the gun found in Ms. List's yard.

The evidence at trial showed that the Defendant fired at the victim, shooting the victim in the chest, which caused her death. Although there was evidence that the victim provoked the Defendant, the jury's verdict of second degree murder was supported by sufficient evidence. The Defendant is not entitled to relief as to this issue.

### B. Exclusion of Evidence of the Victim's Prior Gun Use

The Defendant argues that the trial court erred by excluding evidence of the victim's prior gun use because the proof "was essential to corroborate the self-defense claim." The State responds that the Defendant has waived this claim by failing to call Ms. List at trial to testify about the victim's acts.

The trial court initially excluded the testimony about the victim firing into the air; however, after additional evidence was presented confirming that the Defendant was aware of this incident, the Defendant asked the trial court to reconsider its ruling in light of the new information. Considering the new evidence, the trial court reversed its ruling, finding the testimony admissible. The following exchange then occurred between the trial court and defense counsel:

> Court: So - - but what I was going to say is, I'm going to leave it to the defense how they want to bring that up. They can do it in their own proof or they can just recall it during the State's

proof. . . . [H]owever the . . . defense wants to bring that out. Y'all can discuss it if you want to and let me know, all right.

Defense:       Yes, Your Honor.  I do believe it would be appropriate for the State to recall her so that we can cross.

Court:          All right.  Well, she would - - I would consider her a hostile witness or an adverse where you would be able to cross, regardless; so . . .

Defense:       That's fine, Judge.

Court:          Whichever way y'all want to do it, you just decide, all right.

Defense:       That's fine, Judge.

Again, before the defense presented proof, the trial court reminded the parties of its ruling that the testimony about the victim's prior gun use was admissible.  Defense counsel acknowledged the reversal but stated that the defense planned to introduce the information through another witness.  The Defendant presented two witnesses but questioned neither about the victim's prior gun use.

Based upon our review of the record, the trial court, ultimately, did not exclude the testimony.  The Defendant asked the trial court to reconsider its ruling excluding the testimony, and the trial court did so.  It ruled that the evidence was admissible.  The Defendant's decision not to include that evidence does not constitute error by the trial court. Appellate courts are not required to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."  T.R.A.P. 36(a).  In this case, the evidence was ruled admissible, and it appears, based on defense counsel's statement to the trial court, a strategic decision was made to introduce the information through another avenue.  Further, we do not find that this issue requires plain error relief.  The Defendant is not entitled to relief as to this issue.

### C. Jury Instruction on Flight

The Defendant challenges the jury instruction on flight, asserting that "the instruction was both factually unwarranted and prejudicial, depriving [the Defendant] of a fair trial."  The State responds that the proof fairly raised the issue of flight and, therefore, the trial court's instruction was proper.  We agree with the State.

20

Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions *de novo* without a presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001) (citing *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001)).

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011) (citations omitted). The instruction must provide a "'clear and distinct exposition of the law'" to "satisf[y] a defendant's constitutional right to trial by jury." *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987)). Further, the trial court "must instruct the jury on those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). "An instruction is 'prejudicially erroneous' when 'it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law.'" *State v. Smith*, 492 S.W.3d 224, 245 (Tenn. 2016) (quoting *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998))

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). There is sufficient evidence to justify a flight instruction when the State has established "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." *State v. Whittenmeir*, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986) (internal quotation marks omitted). The State may satisfy the subsequent hiding out, evasion, or concealment requirement by presenting proof from which a jury might infer that the defendant committed such acts. *State v. Staggs*, No. M2011-01675-CCA-R3-CD, 2013 WL 2722286, at *18 (Tenn. Crim. App. June 12, 2013) (citing *State v. Wilks*, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999)). This court has previously explained that "[t]he law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction." *Whittenmeir*, 725 S.W.2d at 688 (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)). It is proper for the trial court to instruct the jury on flight when the issue has been raised by the proof. *See State v. Kendricks*, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996).

Here, the trial court instructed the jury on flight as follows:

The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading

arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

In this case, the Defendant fired a gun at the victim and then ran next door to the neighbor's house. The Defendant confessed to the neighbor that she had shot the victim. By all accounts, the Defendant then left in her car, nearly hitting witnesses. The police were in "pursuit" of the Defendant as she drove toward White Bluff, potentially requiring assistance from other law enforcement officers to stop her with the use of spikes. This evidence sufficiently raised the issue of flight, as there was proof of both a "leaving the scene" and an "evasion." *Burns*, 979 S.W.2d at 289-90. The trial court did not err in instructing the jury on flight.

Nonetheless, even if the instruction on flight should not have been given, any error is not grounds for reversal. *See State v. Smith*, 893 S.W.2d 908, 918 (Tenn. 1994). The trial court instructed the jury that whether the defendant fled was a question for its determination and that flight alone was not sufficient to find the defendant guilty. This instruction, along with the proof of the Defendant's guilt, renders any error in giving the flight instruction harmless. *See id.*; *State v. Hall*, No. W2008-01875-CCA-R3-CD, 2010 WL 571790, at *9 (Tenn. Crim. App. Feb. 18, 2010), *perm. app. denied* (Tenn. Sept. 7, 2010) (determining that, even where proof of the defendant's flight was "tenuous," the trial

court's decision to give the jury an instruction on flight was harmless considering the overwhelming evidence of the defendant's guilt). The Defendant is not entitled to relief.

## D. Excessive Sentence

The Defendant challenges her sentence as excessive. Specifically, the Defendant argues that the trial court gave "undue weight to enhancement factors while failing to properly consider mitigating factors." The State responds that the trial court properly exercised its discretion by imposing a within-range sentence consistent with the purposes and principles of sentencing. We agree with the State.

On appeal, a defendant bears the burden of establishing that his or her sentence is improper. T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, if the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The Defendant challenges the weight the trial court gave to enhancement factors (1) and (9) and mitigating factors (2) and (13). We note that the trial court also applied enhancement factor (10), however, the Defendant does not challenge the application of this factor. In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

The trial court did not abuse its discretion in sentencing the Defendant. The trial court found that the Defendant was a Range I, standard offender, and this finding is not challenged on appeal. The Defendant was convicted of second degree murder, a Class A felony. T.C.A. § 39-13-210. The sentencing range for a Range I offender for a Class A felony is fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1). The trial court chose a sentence in the appropriate range when it sentenced the Defendant to twenty years.

In terms of the enhancement factors, the trial court found that the Defendant had a "previous history of criminal convictions or criminal behavior" and that she "possessed or employed a firearm . . . during the commission of the offense." T.C.A. §§ 40-35-114(1),

24

(9). The record supports the trial court's findings. To the extent that the Defendant argues that the trial court gave undue weight to these enhancement factors, "Mere disagreement with the weight the trial court gives to properly assigned factors is not grounds for appeal." *State v. Rousseau*, No. M2023-01320-CCA-R3-CD, 2024 WL 2797436, at *6 (Tenn. Crim. App. May 31, 2024), *perm. app. denied* (Tenn. Aug. 14, 2024).

The Defendant also asserts that the trial court failed to give sufficient weight to the mitigating factors. The trial court afforded some weight to factors (2), (9), and (13). T.C.A. § 40-35-113. However, as stated above, the statutory mitigating factors are advisory only, and "a trial court's weighing of various mitigating . . . [is] left to the trial court's sound discretion." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). As long as the sentence is consistent with the purposes and principles of the sentencing act, this court is bound by the trial court's sentencing decision. *Id*. at 345–46. We conclude that the trial court did not impose an excessive sentence in this case. The Defendant is not entitled to relief as to this issue.

### E. Cumulative Error

Lastly, the Defendant contends that the cumulative effect of the errors in this case deprived her of a fair trial. We considered each of the Defendant's issues on appeal and concluded that the trial court did not err. Accordingly, the cumulative error doctrine does not apply. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE